THIRD DIVISION
 March 05, 1997

No. 1-95-3171

In re the ESTATE of J.M., An Alleged
Disabled Person.

(LEGAL ADVOCACY SERVICE, Counsel for
J.M.,

 Sanctions Petitioner-Appellant,

 v.

LAW OFFICES of NYE and ASSOCIATES, LTD.,

 Sanctions Respondent-Appellee).)
)
)
)
) 
)
)
)
)
)
)
)
)Appeal from the
Circuit Court of
Cook County

94 P 5060

Honorable
Marjan Staniec,
94 P 5060

JUSTICE CAHILL delivered the opinion of the court:
 We review a trial court order that denied a petition for
sanctions under Supreme Court Rule 137. Legal Advocacy Service
(LAS) filed the petition against the lawyers who represented the
father of a person alleged to be disabled under section 11a-2 of
the Probate Act of 1975 (755 ILCS 5/11a-2 (West 1994)). We
affirm.
 On May 27, 1994, J.M., 18 years old, was admitted to Forest
Hospital under an order of detention from the Circuit Court of
Cook County. On May 31, 1994, J.M.'s parents consulted with
Sandra D. Nye, a partner in the Law Offices of Nye and
Associates, Ltd. J.M.'s parents told Nye that they were frantic
about their daughter's situation, since insurance coverage for
in-patient care would soon run out. 
 On May 31 or June 1 Sandra Nye consulted with Dr. Milton
Kanter, J.M's treating psychologist, and reviewed J.M.'s mental
health records. Sandra Nye and Jonathan Nye (also an attorney at
the firm) then spoke with Dr. Howard Klapman, J.M.'s treating
psychiatrist, sometime before June 7, 1995. Based upon Dr.
Kanter's and Dr. Klapman's concerns, Sandra Nye concluded that
guardianship appeared to be appropriate for J.M. 
 Dr. Klapman prepared a physician's report on June 7, 1994,
while J.M. was still at Forest Hospital. He talked to Sandra Nye
about the contents of his report and sent the report to her the 
same day. Dr. Klapman's report recommended that J.M. receive
long-term hospitalization followed by long-term residential
treatment. The report also stated that J.M. was chronically
suicidal and episodically homicidal. Klapman concluded that J.M.
was incapable of making responsible personal or financial
decisions because of her poor reality testing, grandiosity, sense
of entitlement and impulsivity. The doctor reported that she 
refused medication and could not make rational decisions about
her treatment and need for medication because of a lack of
insight into the nature and consequences of her illness. 
 Dr. Klapman and Sandra Nye also discussed J.M.'s need for
psychotropic medication. Dr. Klapman believed, on June 7, that a
medication plan might benefit J.M. Later at the sanctions
hearing he testified that he did not believe J.M. required
involuntarily administered medication at the time she was
released from the hospital on June 15. He also testified that
she needed to be "stabilized," and that filing a guardianship
petition on June 10 seemed to have a therapeutic affect on her.
 Sandra Nye told J.M.'s father, sometime before the petition
for plenary guardianship petition was filed, that she would feel
better about filing for guardianship if J.M. were examined by an
independent psychiatric expert. J.M. agreed to be examined, and
Dr. Edward Wolpert examined her on June 13, 1994.
 On June 10, 1994, before Dr. Wolpert examined J.M., Nye and
Associates filed a petition for the appointment of a plenary
guardian. Nye and Associates did not attach Dr. Klapman's report
to the petition, and did not request a court-ordered evaluation
in the petition.
 Sometime after June 13, but before June 21, Sandra Nye spoke
to Dr. Wolpert about his evaluation of J.M. He told Sandra Nye
that he believed guardianship was appropriate because he
suspected that J.M. was mentally ill and could not make
responsible decisions. He also told her that J.M. might benefit
from psychotropic medication to help her through acute distress
at different times. He believed that J.M. might need medication
on a continuous basis as well.
 On June 13, 1994, two days before J.M.'s release from Forest
Hospital, Nye and Associates filed a petition for psychotropic
medication alleging that: "medication is the only viable
treatment for [J.M.'s] condition;" her "prognosis without
medication is dismal;" only with medication would she "be able to
return to normal or near-normal functioning;" and "[l]ess
restrictive services have been explored and have been of no
effect."
 Terrie Rymer, court-appointed Guardian ad litem by an order
entered June 30, testified at the sanctions hearing that Dr.
Klapman told her J.M's condition did not require involuntarily
administered medication, and that Dr. Klapman did not intend to
force medication. The date of this conversation is not in the
record. Rymer stated that Dr. Klapman told her he assumed the
petition for psychotropic medication was filed in the event
medication was required. 
 On June 15, Dr. Klapman released J.M. to live with a
friend's family and attend an out-patient program at Forest
Hospital. Dr. Klapman testified that J.M. was not placed in
long-term residential treatment as he recommended in his report
because of a lack of funding from her insurance company. 
However, he added that discharge and placement in the out-patient 
program was not against his medical advice since J.M. had shown
improvement. 
 On June 21, 1994, six days after J.M.'s release, Nye and
Associates filed a petition for temporary guardianship. The
petition alleged that J.M required immediate appointment of a 
temporary guardian. That petition alleged that she was unable to
make responsible decisions for her care and welfare, had refused
medication, and that she would lose insurance benefits because of
her alleged refusal to release records to her insurer. Also on
June 21, Nye and Associates filed the physician's report prepared
by Dr. Klapman, which was not dated. At the sanctions hearing
Dr. Klapman testified that the report was prepared on June 7.
 J.M.'s father testified at the sanctions hearing that J.M.
ran away from the family with whom she had been living on or
about July 13. Jonathan Nye testified that sometime after July
13, J.M.'s father directed Nye and Associates to stop legal
proceedings. The father told Nye he no longer had the financial
or emotional resources to continue the fight. Mr. Nye stated
that he believed he needed a doctor's report that concluded that
J.M. was not in need of guardianship to obtain a court ordered
dismissal of the petitions. 
 Jonathan Nye telephoned Dr. Klapman shortly after J.M.'s
disappearance and asked him to prepare a second physician's
report indicating that J.M. no longer required a guardian. Dr.
Klapman refused. A few days later, Mr. Nye again asked Dr.
Klapman to prepare such a report. Dr. Klapman again refused.
 LAS filed a motion to dismiss the petitions on August 3,
1994. The same day LAS filed a petition for sanctions and later
amended it. The amended petition for sanctions was filed on
behalf of LAS and asked that Rule 137 sanctions be imposed
against Nye and Associates for the firm's failure to comply with
Rule 137 before the filing of each petition.
 On September 8, 1994, the court entered an agreed order
dismissing the substantive petitions and reserved ruling on the
sanctions request. 
 At the sanctions hearing both parties presented expert
testimony about the kind of investigation an attorney must
conduct before filing guardianship petitions. John Wank,
Director and Chief Counsel of the Office of State Guardian, a
division of the Illinois Guardianship and Advocacy Commission,
testified on behalf of LAS. Sandra Nye, a former Director of the
Illinois Guardianship and Advocacy Commission, testified as an
expert on behalf of her law firm. 
 Nye and Associates moved for a directed verdict after LAS
presented its case. The court denied the motion. 
 At the conclusion of the hearing the trial court found that
Nye and Associates had not violated Supreme Court Rule 137. 
 The proper standard of review is whether the court's finding
is against the manifest weight of the evidence. Sajdak v.
Sajdak, 224 Ill. App. 3d 481, 586 N.E.2d 716 (1992).
 Supreme Court Rule 137 states, in part, that:
 "the signature of an attorney or party constitutes a
 certificate by him that he has read the pleading,
 motion or other paper; that to the best of his
 knowledge, information, and belief formed after
 reasonable inquiry it is well grounded in fact and is
 warranted by existing law or a good-faith argument for
 the extension, modification or reversal of existing
 law, and that is not interposed for any improper
 purpose, such as to harass or to cause unnecessary
 delay or needless increase in the cost of litigation
 ***. If a pleading, motion or other paper is signed in
 violation of this rule, the court *** may impose an
 appropriate sanction ***. Supreme Court Rule 137 (155
 Ill. 2d R.137).
 The rule is penal in nature, and must be strictly construed. 
Each element of a violation must be specifically proved. Shea,
Rogal & Associates, Ltd. v. Leslie Volkswagen, Inc., 250 Ill.
App. 3d 149, 621 N.E.2d 77 (1993). 
 The trial court found that Nye and Associates made
reasonable inquiry into the facts of the case, given the nature
of the proceedings, and found that Nye and Associates did not
file the petitions for an improper purpose.
 LAS first argues that the trial court erred by creating a
general exception to Rule 137 for mental health cases. In
support of this allegation LAS points to the court's language in
its order denying sanctions: 
 " *** [W]e conclude that what may generally constitute
 'reasonable inquiry' into facts in other than mental
 health cases should not be construed to apply to mental
 health cases in which there is a greater uncertainty
 about facts, changes often on a day-to-day basis -
 because of the fluid dynamics in the mood, behavior,
 refusal to cooperate, dangerous propensities toward
 self and others, and unpredictable mood swings of the
 patient."
 LAS reads the court's words to mean the court created an
exception to reasonable inquiry for mental health cases. A
reading of the full order makes clear that the trial court
applied the exact language of Supreme Court Rule 137 to the facts
of the case. We believe a fair reading of the court's language
is that the circumstances of any proceeding are relevant to the
issue of reasonable inquiry. This is true in all Rule 137
inquiries. A court must consider reasonableness based upon the
circumstances at the time the pleading was filed. Shea, Rogal &
Associates, Ltd., 250 Ill. App. 3d at 153, 621 N.E.2d 77; Lewy v.
Koeckritz International, Inc., 211 Ill. App. 3d 330, 570 N.E.2d
361 (1991). 
 LAS argues that if the trial court did not create a separate
standard and err as a matter of law, then the facts here support
the imposition of sanctions and the failure to impose them is an
abuse of discretion.
 Nye and Associates produced sufficient evidence from which
a court could conclude that it made reasonable inquiry before
each filing. Nye and Associates did not rely on J.M.'s parents'
representations. They talked to two of J.M.'s treating doctors
and reviewed J.M.'s medical records before filing the first
petition for plenary guardianship. The record also established
that Sandra Nye received a copy of Dr. Klapman's report and
discussed it with him before she filed the first petition. 
Sandra Nye then spoke with J.M.'s parents and the treating
doctors numerous times after the first filing, and referred
J.M.'s parents to a second psychiatrist for yet another opinion
after the filing of the first petition.
 The petition for involuntary medication was filed on June
13, six days after Dr. Klapman prepared his report concluding
J.M. needed medication for her condition. However, Dr. Klapman
testified at the hearing that he did not believe J.M. needed
involuntary medication at the time of her release on June 15th. 
The record does not divulge whether this opinion was communicated
to Nye and Associates. 
 The temporary guardianship petition was filed on June 21,
six days after J.M.'s release from the hospital and three weeks
after Dr. Klapman prepared his report. At the heart of LAS's
argument is that the release of J.M. on June 15 was a change in
circumstances sufficient to overcome the physicians' reports and
evaluations made between June 7 and June 15. Dr. Klapman's
testimony indicates that he never changed his recommendation of
guardianship for J.M. even though she had been released from the
hospital on June 15. The record reveals that J.M.'s rel